Dorothy C. BAILEY et al., Plaintiffs,

v.

The OHIO STATE UNIVERSITY et al., Defendants.

No. C–2–78–94.

United States District Court,
S. D. Ohio, E. D.

April 10, 1980.

Robert F. Laufman, Maggie Quinn, Alphonse A. Gerhardstein, Cincinnati, Ohio, for plaintiffs.

William J. Brown, Atty. Gen. of Ohio, Thomas B. Ridgley, G. Ross Bridgman, Larry R. Thompson, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendants.

**602**

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the motion of the defendants to dismiss the plaintiffs' second and third claims for relief. The plaintiffs are two professors of The Ohio State University College of Social Work who charge the university and certain university officials with maintaining policies that discriminate against them on the basis of sex with respect to hiring, promotion, salary and working conditions. The Court will address the claims in the same order as have the parties.

### A. The Third Claim

In their second amended complaint, the plaintiffs' third claim for relief is that The Ohio State University and the individual defendants have deprived the plaintiffs of their constitutional rights in violation of 42 U.S.C. § 1983. The defendants seek dismissal of this claim, asserting that the university and its officials are immune from suit under the eleventh amendment to the Constitution of the United States.

In *Chisholm v. Georgia,* 2 Dall. 419, 1 L.Ed. 440 (1793), the Supreme Court ruled that the state of Georgia could be sued by private citizens in a federal court. Shortly thereafter, the eleventh amendment was adopted in order to overrule constitutionally the *Chisholm* decision. The eleventh amendment provides as follows:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

*U.S.Const., Amend. 11.* In addition to the amendment, the Supreme Court eventually rejected the reasoning of *Chisholm* in *Hans v. Louisiana,* 134 U.S. 1, 18–19, 10 S.Ct. 504, 508–509, 33 L.Ed. 842 (1890), holding that, even though the eleventh amendment was silent as to federal suits against a state by its own citizens, Article III and the Act of Congress conferring jurisdiction should not be construed to create such "anomalous and unheard of" suits or "new and strange jurisdictions." *Id.* at 18, 10 S.Ct. at 508.

Other cases, however, culminating in the famous decision in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), evolved the rule that a state official directly involved in an unconstitutional act could be subject to suit in federal court. Such an official was not deemed to be acting as the state, since the state had no power to authorize unconstitutional acts. Thus, as in *Ex parte Young,* the Attorney General could be sued, but the state itself could not.

There are two other important limits on the reach of the immunity conferred by the eleventh amendment and the decision in *Hans v. Louisiana, supra* [hereinafter referred to as "eleventh amendment immunity"]. First, it has long been recognized that the immunity can be waived by state consent to the suit. *E. g., Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 882, 27 L.Ed. 780 (1883). Second, the fifth section of the fourteenth amendment, which grants to Congress the power to pass laws enforcing the other provisions of the fourteenth amendment, permits Congress to authorize federal suits against the state for that purpose. *E. g., Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). This latter limit on state immunity from federal suit is important because of the power Congress had to remove that immunity by including states as "persons" within the meaning of 42 U.S.C. § 1983, the statute upon which the plaintiffs here base their third claim for relief. The Supreme Court determined in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, however, that cities and municipal corporations were not § 1983 "persons," and it followed ineluctably that states were also not included as "persons" under the statute. *Fitzpatrick v. Bitzer, supra,* 427 U.S. at 452, 96 S.Ct. at 2669.

A further step in the development of eleventh amendment jurisprudence was taken in 1974 when the Supreme Court decided *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *Edelman* limited the *Ex parte Young* exception to eleventh amendment immunity by holding

that a federal court may not award retroactive relief consistently with the eleventh amendment where that relief will require the expenditure of funds directly from the state treasury. The *Edelman* decision added a new tier to state immunity from federal suit which looked not to the fact of the suit against the state, but to the type of relief sought. Thus, after *Edelman*, relief in a suit properly brought under *Ex parte Young* which burdened the state treasury could only be prospective in nature. *E. g., Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

■ The relationship of eleventh amendment immunity and § 1983 became decidedly more complex when the supreme Court decided *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which overruled *Monroe v. Pape, supra*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), finding that Congress had intended to include a municipality as a "person" in § 1983. The question arose, therefore, whether a state was also a "person" under the statute and, if so, whether the eleventh amendment was an obstacle to such a suit against a state. After *Monell*, some courts apparently took the position that a state was a "person" under § 1983 and could be sued as long as the *Edelman* limits on retroactive relief were observed. *See, e. g., Gay Student Services v. Texas A & M University*, 612 F.2d 160, 165 (CA 5, 1980). Such notions should have been dispelled by the Supreme Court's decision in *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) and subsequent dicta in *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).[1] In *Alabama v. Pugh, supra*, the Court summarily held that the State of Alabama could not be joined as a defendant in a claim brought under § 1983 without violating the eleventh amendment. It is significant that the relief awarded against Alabama was in the form of an injunction.

The opinion in *Quern v. Jordan, supra*, explained that *Alabama v. Pugh* was so decided because a state cannot even be named as a defendant in a § 1983 action without violating the eleventh amendment. While recognizing that Congress could have abrogated such state immunity because § 1983 was enacted pursuant to § 5 of the fourteenth amendment, the opinion in *Quern* stated that Congressional elimination of eleventh amendment immunity would not be implied, and that there was no express indication of such an intent in the statute or in its enactment process. *Quern v. Jordan*, 440 U.S. 332, 340–45, 99 S.Ct. 1139, 1145–1147, 59 L.Ed.2d 358 (1979). The fact that Congress did not intend to abrogate eleventh amendment immunity for the states means, necessarily, that a state is not a "person" under § 1983 and no suit for any relief may be maintained against the state under § 1983.

■ Turning to the present dispute, the propriety of the plaintiffs' claim based upon § 1983 depends upon whether the university is more properly characterized as a reasonably autonomous political subdivision such as a city or a school district, or as a dependent instrumentality deemed to be merely an "arm of the state." If the latter, then the university must be dismissed as a defendant to the claim based upon § 1983 because such "instrumentalities" are treated as the state for purposes of eleventh amendment immunity. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

[5] Before determining the university's eleventh amendment status, however, the Court notes that the university officials named as defendants are plainly not "the state," and they may be sued under § 1983, *Ex parte Young, supra*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), as long as the relief awarded does not require the direct expenditure of funds from the state trea-

---

1. The Court uses the phrase "should have been dispelled" because the decision in *Gay Student Services, supra*, which found it unnecessary to decide whether Texas A & M was the equivalent of the state for purposes of eleventh amendment immunity because prospective injunctive relief had been requested, was handed down almost a year after *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

sury for past wrongs, whether that relief be characterized as damages or restitution. *Edelman v. Jordan, supra*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Court is of the opinion that it cannot determine with sufficient precision at this point what effect certain forms of relief against the defendant officials may have. The Court will therefore deny the motion to dismiss as to the individual university officials, and await further factual development at trial to determine what further limits may exist under *Edelman.*

The Court must therefore determine whether the university[2] is an immune instrumentality of the state, or a potentially liable political subdivision. Although the issue is one of federal law, the resolution "depends, at least in part, upon the nature of the entity created by state law." *Mt. Healthy, supra*, 429 U.S. at 280, 97 S.Ct. at 572. The plaintiffs do not dispute that Ohio State is considered to be an instrumentality of the state under Ohio law. *Wolf v. Ohio State University Hospital*, 170 Ohio St. 49, 162 N.E.2d 475 (1959); *see* Ohio Revised Code, O.R.C. § 2743.01.

The usual approach of courts attempting to determine the status of public universities has been to look for indicia of fiscal and academic autonomy. The plaintiffs here suggest that the factual record in this case is presently insufficient to support any decision on this issue. There has been no allegation or argument, however, that the university does not actually operate in accordance with the statutory scheme which created it. If the state statutes, of which this Court may take judicial notice, plainly disclose a relationship between the school and the state which shows Ohio State to be an "alter ego" of the state, then there is no greater need to avoid deciding this issue on a motion to dismiss than there was in *Lake Country Estates v. Tahoe Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). In that case, the Supreme Court reviewed an appeal from the dismissal of a complaint, and held as a matter of law that a regional planning agency created by an interstate compact between California and Nevada did not enjoy eleventh amendment immunity.

The Ohio State University is created by a statute which describes it as an "educational institution." O.R.C. § 3335.01. Although a state university is elsewhere defined as "a body politic and corporate," O.R.C. § 3345.-011, Ohio State is not created as a corporation with perpetual existence. The board of trustees is generally given the power to sue and be sued and to contract, O.R.C. § 3335.03, but those powers are elsewhere specifically defined and limited. Notably, the entire board of nine directors is appointed by the governor of the state, O.R.C. § 3335.02. *See Lake County Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) (only four of ten members of regional agency selected by the states involved). The trustees are given the power to adopt rules and regulations, O.R.C. § 3335.08, but it is nowhere suggested that the state could not statutorily modify or invalidate such rules. *See Tahoe Planning Agency, supra*, 440 U.S. at 402, 99 S.Ct. at 1178 (commission's rules not subject to state veto). This structure demonstrates that, as to general powers, Ohio State is much less autonomous in its relation to the state than other universities which have been held not to be instrumentalities of the state. In *Gordenstein v. University of Delaware*, 381 F.Supp. 718 (D.Del.1974), for example, the university was granted perpetual succession and existence, the full powers of a corporation and only eight of the twenty-eight trustees were appointed by the governor. *Id.* at 721–22.

As to fiscal matters, the statutory scheme creates relatively tight controls on Ohio State's economic activities. While a large percentage of the university's revenue certainly comes from its own operations as well as state appropriations, the disposition

---

**2.** Although the complaint names "the Ohio State University College of Social Work," there is no basis for distinguishing the university and one of its undergraduate divisions for the purpose of the eleventh amendment issue here considered.

of that revenue is regulated by statute, *see* O.R.C. § 3345.05, and the university is not dependent on revenue from local political subdivisions as was the case in *Tahoe Regional Planning Agency, supra,* 440 U.S. at 401–02, 99 S.Ct. at 1177–1178. The title to all land used by the university is held in the name of the State of Ohio. O.R.C. § 3335.13; O.R.C. § 3345.12(P). Only property held for investment and in the endowment portfolio shall be held in trust by the board for the university. O.R.C. § 3335.13 . The board of trustees is prohibited from contracting "a debt not previously authorized by the general assembly." O.R.C. § 3335.10. The limited ability to issue bonds and other obligations is regulated in detail. O.R.C. § 3345.12. Unlike some local school boards, the university has no taxing power. *See Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). All aspects of the university's economic life are subject to state audit and other forms of scrutiny. O.R.C. § 3345.07(B) (trustees' annual report shall include "amounts of receipts and disbursements"); O.R.C. § 3345.03 (university must pay cost of inspection of accounts by state bureau of inspection and supervision of public offices); O.R.C. § 3345.05 ("all receipts and expenditures are subject to the inspection of the auditor of the state").

With respect to administration and education, the state statutes are surprisingly detailed. Administratively, for example, the statutes prescribe the number of trustees required for a quorum, O.R.C. § 3335.06, the duration of contracts concerning fire protection, O.R.C. § 3345.09, and even the penalty for the unauthorized duplication of keys, O.R.C. § 3345.13, 3345.99. As to education, state law mandates such specific projects as the "Ohio rehabilitation center" for the rehabilitation of the physically handicapped, O.R.C. § 3335.50, and a college of medicine program in alcoholism research, O.R.C. § 3335.151. The general assembly has also mandated a department of ceramics, O.R.C. § 3335.20, a school of mines and mine engineering, O.R.C. § 3335.31, and a collection of specimens in mineralogy, geology, botany and natural history, O.R.C. § 3335.19.[3]

The plaintiffs have argued vigorously that the judgment which they might win in this court would not have to be paid from the state treasury, but could be satisfied from the university's own revenue. While the degree and directness of the impact of a judgment on the state treasury is relevant to the determination of "instrumentality" status, it is far from dispositive. Payment from the state treasury may well be a dispositive factor in determining whether the rule of *Edelman v. Jordan, supra,* limits certain kinds of relief, but that factor will not control the initial decision that an entity is or is not an instrumentality. The fact that a state agency's operations generate revenue will not *ipso facto* transform that agency into a political subdivision, especially where there exist other indicia of pervasive state fiscal and administrative control as in the case at bar. The fact that Ohio State's revenues are completely subject to audit by the state, may not be used to incur a debt unauthorized by the state general assembly and are managed by a board of trustees entirely appointed by the governor convinces this Court that the university is an instrumentality of the state even though it does not rely exclusively on appropriations from the state treasury for operating funds.

---

**3.** The plaintiffs have described the Ohio State statutory framework as "nearly identical" to the charter at issue in *Hopkins v. Clemson Agricultural College,* 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890 (1911). It should be noted, however, that a majority of the Clemson trustees were appointed not by the state, but by the provisions of Dr. Clemson's will. *Id.* at 638, 31 S.Ct. at 654. There was also an express disclaimer in the *Clemson* charter of state liability for any debt. *Id.* at 639, 31 S.Ct. at 655. *See*

*Lake Country Estates v. Tahoe Planning Agency,* 440 U.S. 391, 402, 99 S.Ct. 1171, 1178, 59 L.Ed.2d 401 (1979). The Court does not wish to suggest, however, that the *Clemson* decision turned upon these factors or even employed the same analysis used in this opinion. Nonetheless, the Court deems its approach to be mandated by the *Mt. Healthy* and *Tahoe Planning Agency* decisions which post-date and, where in conflict, supersede the *Clemson* decision.

This Court therefore agrees with the Eastern District of Virginia "that Ohio State is the alter ego of the State of Ohio for eleventh [a]mendment purposes." *Ottinger v. Riggs*, Civil Action No. 79–262–A at 6 (E.D.Va.1979). The plaintiffs' third claim for relief will therefore be dismissed as to the defendant university.

### B. The Second Claim

The second claim for relief in the plaintiffs' second amended complaint states that "[t]he defendant O.S.U. has discriminated against the plaintiffs on the grounds of sex in violation of their rights secured by the Fourteenth Amendment to the United States Constitution." This claim is made solely against the university, and jurisdiction is asserted pursuant to 28 U.S.C. § 1331. The plaintiffs seek to have the Court recognize a direct cause of action for damages based upon the fourteenth amendment analogous to the cause of action for damages based upon the fourth amendment recognized by the Supreme Court in the landmark case of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

The Court need not decide whether after *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a *Bivens* cause of action would be necessary and appropriate to vindicate the interest asserted by the plaintiffs in this case. *See Bivens, supra*, 403 U.S. at 407, 91 S.Ct. at 2010 (Harlan, J., concurring). The Court has already determined that Ohio State enjoys eleventh amendment immunity from federal suit. Congress did not enact 28 U.S.C. § 1331 pursuant to § 5 of the fourteenth amendment, and a federal court has no similar power to abrogate eleventh amendment immunity by recognizing a damage remedy for a constitutional wrong. Since Ohio State is the only defendant on the second claim, and Ohio State is immune from suit, the second claim must be dismissed in full.

WHEREUPON, the Court determines that the motion to dismiss is meritorious in part and it is therefore GRANTED in part. The second claim for relief, brought against the university directly under the fourteenth amendment is hereby DISMISSED in full. The university is also DISMISSED as a defendant on the third claim for relief. The motion to dismiss the third claim as to the individual defendants is hereby DENIED.

IT IS SO ORDERED.