**Robert HALL, Plaintiff-Appellant,**

**v.**

**MEDICAL COLLEGE OF OHIO AT TO-LEDO, et al., Defendants-Appellees.**

**No. 83–3256.**

United States Court of Appeals, Sixth Circuit.

Argued March 7, 1984.

Decided Aug. 28, 1984.

Michael N. Vaporis, Gordon A. Senerius, argued, Toledo, Ohio, for plaintiff-appellant.

John F. Hayward, Shumaker, Loop & Kendrick, Renee Birnbaum, argued, Ronald S. Moening, argued, Robison, Curphey & O'Connell, Toledo, Ohio, for defendants-appellees.

Before MERRITT and KRUPANSKY, Circuit Judges, and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

Robert Hall, Plaintiff-Appellant, has appealed to this Court from a summary judgment of the Federal District Court for the Northern District of Ohio, Western Division, dismissing his civil rights complaint which he has filed against the Medical College of Ohio at Toledo (MCO) and its administrative and faculty personnel. In that complaint, Hall sought damages and reinstatement as a medical student of the College, following his dismissal therefrom on June 26, 1978, for academic dishonesty, af-

ter notice of the charges and hearing thereon and an administrative appeal. Hall alleged racial discrimination by MCO and its personnel, in violation of 42 U.S.C. §§ 1981, 1983, and 2000d, and a violation of his constitutional due process rights.

Hall filed a motion for partial summary judgment, and MCO and its personnel also filed a motion for summary judgment. The District Court, in a carefully prepared opinion and order, denied Hall's motion for partial summary judgment and granted the defendants' motion for summary judgment. The court held that MCO is an agency, arm and alter ego of the State of Ohio, and that suit against the school and its officers is barred by the Eleventh Amendment to the United States Constitution, which provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

With respect to the school personnel, the court held that they had a complete defense of qualified immunity from personal liability for damages for acts performed within the scope of their official duties. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The court then entered judgment dismissing Hall's entire complaint, including his claim for reinstatement.

The appeal has been heard by this Court on the briefs, appendices and arguments of counsel. For the reasons stated, we affirm the judgment of the District Court.

## I

### Eleventh Amendment

#### A

■ A suit by a private party which, for past acts or omissions, seeks to impose legal or equitable liability payable from state funds, is barred in a federal court by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This is so even when only individual state officials are the nominal defendants but the state is the real, substantial party in interest. *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).

■ When an action is brought against a public agency or institution, and/or the officials thereof, the application of the Eleventh Amendment turns on whether said agency or institution can be characterized as an arm or alter ego of the state, or whether it should be treated instead as a political subdivision of the state. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). Municipalities, counties and other political subdivisions (e.g., public school districts) do not partake of the state's Eleventh Amendment immunity. *Id.; Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890). *See also Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979). Therefore, the question here is whether MCO can be considered an "arm" or "alter ego" of the State of Ohio, entitled to the immunity afforded by the Eleventh Amendment, or whether it is merely a political subdivision which enjoys no such immunity.

The great majority of cases addressing the question of Eleventh Amendment immunity for public colleges and universities have found such institutions to be arms of their respective state governments and thus immune from suit. *See, United Carolina Bank v. Board of Regents*, 665 F.2d 553 (5th Cir.1982) (Stephen F. Austin State University in Texas); *Rutledge v. Arizona Board of Regents*, 660 F.2d 1345 (9th Cir. 1981) (Arizona State University), *aff'd sub nom. Kush v. Rutledge*, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *Perez v. Rodriquez Bou*, 575 F.2d 21 (1st Cir.1978) (University of Puerto Rico); *Jagnandan v. Giles*, 538 F.2d 1166 (5th Cir.1976) (Mississippi State University), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083

(1977); *Prebble v. Brodrick,* 535 F.2d 605 (10th Cir.1976) (University of Wyoming); *Long v. Richardson,* 525 F.2d 74 (6th Cir. 1975) (Memphis State University); *Brennan v. University of Kansas,* 451 F.2d 1287 (10th Cir.1971); *Walstad v. University of Minnesota Hospitals,* 442 F.2d 634 (8th Cir.1971); *Moxley v. Vernot,* 555 F.Supp. 554 (S.D.Ohio 1982) (University of California at Irvine); *Vaughn v. Regents of University of California,* 504 F.Supp. 1349 (E.D.Cal.1981); *Weisbord v. Michigan State University,* 495 F.Supp. 1347 (W.D. Mich.1980); *An-ti Chai v. Michigan Technological University,* 493 F.Supp. 1137 (W.D.Mich.1980); *Zentgraf v. Texas A & M University,* 492 F.Supp. 265 (S.D.Tex.1980); *Bailey v. Ohio State University,* 487 F.Supp. 601 (S.D.Ohio 1980); *Henry v. Texas Tech University,* 466 F.Supp. 141 (N.D. Tex.1979). But see *Goss v. San Jacinto Junior College,* 588 F.2d 96 (5th Cir.1979); *Dyson v. Lavery,* 417 F.Supp. 103 (E.D.Va. 1976) (Virginia Polytechnic Institute); *Gordenstein v. University of Delaware,* 381 F.Supp. 718 (D.Del.1974); *Samuel v. University of Pittsburgh,* 375 F.Supp. 1119 (W.D.Pa.1974), *aff'd in part, rev'd in part,* 538 F.2d 991 (3d Cir.1976). However, "[e]ach state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances." *Soni v. Board of Trustees,* 513 F.2d 347, 352 (6th Cir.1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976).

The District Court, in determining that MCO is an arm of the state, employed the two-pronged analysis set forth in *Unified School District No. 480 v. Epperson,* 583 F.2d 1118, 1121–22 (10th Cir.1978): (1) To what extent does the institution, although carrying out a state mission, function with substantial autonomy from the state government; and (2) To what extent is it financed independently of the state treasury? While this test does address the two principal factors that are most crucial in applying the Eleventh Amendment, we believe the more specific nine-point analysis employed by the Third Circuit in *Blake v. Kline,* 612 F.2d 718 (3d Cir.1979), *cert.*

*denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980), is the better approach for examining the "peculiar circumstances" of different colleges and universities.

In *Blake,* Judge Rosenn utilized the following criteria to examine the position of Pennsylvania's Public School Employees' Retirement Board vis-a-vis the Commonwealth itself:

> * * * [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.

612 F.2d 722 (quoting *Urbano v. Board of Managers,* 415 F.2d 247, 250–51 (3d Cir. 1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970)). We will now proceed to examine these factors with respect to the Medical College of Ohio.

### B

### Status and Nature of MCO under Ohio Law?

In 1964, the Ohio General Assembly created the Toledo State College of Medicine (renamed the Medical College of Ohio at Toledo in 1967). 130 Ohio Laws pt. 2, at 183 (1964) (codified at Ohio Rev.Code Ann. §§ 3350.01–.05 (Page 1980)). Although, as Hall accurately contends, MCO is not in-

cluded within the definition of "state university" found in Ohio Revised Code section 3345.011, it *is* included in the definition of "state university or college" found in section 3345.12(A)(1), and the school is governed by the provisions of Revised Code chapter 3345, entitled "State Universities—General Powers." *See generally* Ohio Rev.Code Ann. §§ 3345.01–.99 (Page 1980 & Supp.1983).[1]

We also see that Ohio considers such colleges and universities to be part of the "State" for purposes of its sovereign immunity. In *Thacker v. Board of Trustees,* 35 Ohio St.2d 49, 298 N.E.2d 542 (1973), *overruled in part on other grounds, Schenkolewski v. Cleveland Metroparks System,* 67 Ohio St.2d 31, 36 & n. 4, 426 N.E.2d 784, 787 & n. 4 (1981), the state supreme court reaffirmed an earlier holding that Ohio State University and its hospital "are instrumentalities of the state of Ohio and as such are not suable in tort." Two years later, the legislature passed the Court of Claims Act, Ohio Rev.Code Ann. §§ 2743.01–.20 (Page 1981 & Supp. 1983), by which "[t]he state ... waives its immunity from liability and consents to be sued, and have its liability determined, in the court of claims created in this chapter...."

*Id.* § 2743.02(A)(1). "State" is defined in the Act as follows:

the state of Ohio, including, but not limited to, the general assembly, the supreme court, the offices of all elected state officers, and all departments, boards, offices, commissions, agencies, *institutions,* and *other instrumentalities* of the state of Ohio. "State" does not include political subdivisions.

*Id.* § 2743.01(A) (emphasis added).

The state court of appeals for Hamilton County, in *Collins v. University of Cincinnati,* 3 Ohio App.3d 183, 444 N.E.2d 459 (1981), *motion to certify record overruled,* No. 81–1841 (Ohio Sup.Ct. Jan. 20, 1982), held that the University, after its acquisition by the state in 1977, was an instrumentality of the state amenable to suit only in the court of claims. Although we can find no reported decision, federal or state, dealing specifically with the status of MCO, it is highly significant that the statute which created and governs the University of Cincinnati as a state university is virtually identical in its terms to the statute which created and governs the Medical College of Ohio. *See* Ohio Rev.Code Ann. §§ 3361.-01–.05 (Page 1980).[2] It would therefore

---

1. "State university means a public institution of higher education which is a body politic and corporate. Each of the following institutions of higher education shall be recognized as a state university: university of Akron, Bowling Green state university, Central state university, university of Cincinnati, Cleveland state university, Kent state university, Miami university, Ohio university, Ohio state university, university of Toledo, Wright state university, and Youngstown state university.

   Ohio Rev.Code Ann. § 3345.011 (Page 1980).

   As used in sections 3345.07 [obtaining housing and dining facilities], 3345.11 [obtaining auxiliary facilities], and this section [issuing obligations for purposes of obtaining housing, dining and auxiliary facilities] of the Revised Code:

   "State university or college" means the state universities identified in section 3345.011 of the Revised Code, the northeastern Ohio universities college of medicine, and the medical college of Ohio at Toledo, and, includes the board of trustees of each state university or college.

   *Id.* § 3345.12(A)(1) (Page Supp. 1983).

2. Significantly as well, each of the state universities and colleges created by the Ohio General Assembly in the past two decades (including MCO) are governed by organic statutes with very similar terms. *See* Ohio Rev.Code Ann. §§ 3344.01–.06 (Page 1980) (Cleveland State University); *Id.* §§ 3350.01–.05 (MCO); *Id.* §§ 3350.10–.14 (Northeastern Ohio Universities College of Medicine); *Id.* §§ 3352.01–.14 (Wright State University); *Id.* §§ 3356.01–.05 (Youngstown State University); *Id.* §§ 3359.-01–.05 (University of Akron); *Id.* §§ 3360.-01–.05 (University of Toledo); *Id.* §§ 3361.-01–.05 (University of Cincinnati).

   By way of contrast, the legislature during this same time period made provision for the establishment—by local initiative, *not* directly by state statute—of community college, university branch, technical college and state community college districts which are to be considered political subdivisions of the State of Ohio. *See* Ohio Rev.Code Ann. §§ 3354.-01–.18 (Page 1980 & Supp. 1983) (community colleges); *Id.* §§ 3355.01–.14 (university branches); *Id.* §§ 3357.01–.19 (technical colleges); *Id.* §§ 3358.01–.10 (state community colleges). Thus, by implication, all other col-

appear that Ohio considers MCO an "arm of the state," and not merely a political subdivision thereof. The question of its status for purposes of the Eleventh Amendment is, of course, a matter of federal, not state, law, but Ohio decisions and laws shedding light on the relationship of the school to the state government are important, and potentially controlling. *See Blake v. Kline,* 612 F.2d at 722; *see also Hughes-Bechtol, Inc. v. West Virginia Board of Regents,* 737 F.2d 540 at 542 (6th Cir.1984); *Long v. Richardson,* 525 F.2d at 75, 79.

### Judgment Payable from State or Independent MCO Funds?

The second and third factors identified by the Third Circuit in *Blake* are perhaps the most important of all: Would recovery in damages by Hall against MCO and/or Drs. Ruppert and Kemph in their official capacities require the payment of state funds? In this connection, we must again consult the state statutes governing the school.

The Ohio legislature is required to support MCO "by such sums and in such manner as it may provide," but "[s]upport may also come from other sources." Ohio Rev. Code Ann. §§ 3350.05 (Page 1980). According to the affidavit of MCO President Ruppert, attached to the defendant's summary judgment motion, this "support ... from other sources" constituted from 24 percent of the school's total revenues in 1974 to 54 percent in 1979, and overall comprised 36 percent of the total revenues in years 1974 through 1979. (App. at 205). These additional revenues are derived from charges for patient care in the college hospital, community contracts, federal and private grants and contracts, and tuition and other fees charged to MCO students. Under Revised Code section 3345.05, MCO's board of trustees is not required to deposit such income into the state treasury, but annual reports must be made to the Ohio Board of Regents, and "[a]ll receipts and

expenditures are subject to the inspection of the auditor of state."

Revised Code sections 3345.07, 3345.11, and 3345.12 permit state universities and colleges (including MCO) to issue bonds for the purpose of acquiring housing, dining and auxiliary facilities. Such bonds are to be secured by a pledge of and lien on the revenues of the college or university which are *not* derived from taxation and state appropriations, Ohio Rev.Code Ann. § 3345.12(C) (Page Supp. 1983), and matters relating to the issuance of such bonds and the use of the proceeds thereof are regulated by the legislature in great detail. The property acquired through such bond issues, and the income therefrom, are exempt from all state taxation, *Id.* § 3345.-12(N), and title to all lands so acquired is taken in the name of the State of Ohio, *Id.* § 3345.12(P). By contrast with the community colleges, university branches and technical colleges established under the Revised Code, as well as local public school districts and other political subdivisions, none of the state universities or colleges (including MCO) have power to levy taxes to service such bond issues or otherwise provide revenue independent of state appropriations. *Cf. Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. at 280, 97 S.Ct. at 572; *Goss v. San Jacinto Junior College,* 588 F.2d at 99 n. 5.

Hall makes much of the fact that MCO can avail itself of self-generated income from hospital charges, tuition and the like, and that any judgment rendered against the school or its officers could be paid from funds not appropriated by the Ohio General Assembly. This, however, overlooks the true state of affairs. By statute, the Ohio legislature *permits* the state colleges and universities to retain such funds, rather than require them to be paid into the treasury and then appropriated back to the schools as needed, but it could just as easily amend that statute to require the converse. Moreover, the declining amount of operating funds appropriated by the legis-

leges and universities established *directly* by Ohio statute should not be considered "politi-

cal subdivisions" but instead "institutions" or "other instrumentalities" of the state.

lature indicates that those appropriations are gauged according to the amount of self-generated funds available each year, such that any added expense (e.g., a judgment for Hall in excess of $4,000,000) that could not be met by hospital, tuition or other revenues would have to be covered by an increase in state appropriations.

Such a link between the appropriated and non-appropriated revenues available to MCO (which the record *does not* show to be kept in segregated accounts) has the effect of making any judgment against the school a liability payable from the state treasury. *See United Carolina Bank v. Board of Regents*, 665 F.2d at 560–61; *Jagnandan v. Giles*, 538 F.2d at 1176; *Fitzpatrick v. Bitzer*, 519 F.2d 559, 565 (2d Cir.1975), *aff'd in part, rev'd in part*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). *Cf. Miller-Davis Co. v. Illinois*, 567 F.2d 323 (7th Cir.1977) (no immunity for toll highway authority fund created by a one-time only appropriation from the Illinois legislature). Here, all of MCO's funding, whether from annual or biennial appropriations from the General Assembly, or from other revenues the legislature permits it to retain, is actually derived from the State of Ohio. Accordingly, even though the school " 'might have the *power* to satisfy any judgment won ... such judgment would inevitably have to be paid from "state funds".... ' " *Vaughn v. Regents of University of California*, 504 F.Supp. at 1354 (quoting *Roberson v. Dale*, 464 F.Supp. 680, 689 (M.D.N.C.1979)). Creating any distinction between MCO's appropriated and self-generated revenues in the context of Eleventh Amendment immunity would be a pure exercise in elevating form over substance.

### Governmental or Proprietary Function?

Providing facilities and opportunities for the pursuit of higher education is a long-recognized governmental function. *See Wolf v. Ohio State University Hospital*, 170 Ohio St. 49, 53, 162 N.E.2d 475, 478 (1959), *overruled in part on other grounds, Schenkolewski v. Cleveland Metroparks System*, 67 Ohio St.2d 31, 36 & n.

4, 426 N.E.2d 784, 787 & n. 4 (1981); *see also Vaughn v. Regents of University of California*, 504 F.Supp. at 1353; *Buckton v. NCAA*, 366 F.Supp. 1152, 1156 (D.Mass. 1973). Therefore, with respect to the expulsion of Mr. Hall as an MCO student on grounds of academic dishonesty, the school was certainly engaged in a traditional state activity.

### Corporate Status and Powers?

Revised Code sections 3350.01 through 3350.05, which establish MCO and regulate the organization and powers of its board of trustees, do not confer corporate status, as such, upon the school or its governing board. The trustees are empowered to "do all things necessary for the creation, proper maintenance, and successful and continuous operation of the college," Ohio Rev. Code Ann. § 3350.03 (Page 1980), to "accept donations of lands and moneys for the purposes of such college," *Id.*, to "receive and hold in trust, for the use and benefit of the college, any grant or devise of land, and any donation or bequest of money or other personal property, to be applied to the general or special use of the college," *Id.* § 3350.04, and to "make and enter into all contracts and agreements necessary or incidental to the operation of such college," *Id.*

Some of these powers are perhaps corporate in nature (i.e., those which are ordinary attributes of corporations), but MCO does not enjoy perpetual existence or a conferral of full corporate powers (including express recognition of the power to sue and be sued). *Cf. Soni v. Board of Trustees*, 513 F.2d at 352 (University of Tennessee charter permits it to "sue and be sued, plead and be impleaded, in any court of law or equity in this State or elsewhere."); *Gordenstein v. University of Delaware*, 381 F.Supp. at 721 (University is "a separately incorporated entity with statutorily guaranteed 'perpetual succession and existence' ... [and] 'all the powers and franchises incident to a corporation.' "); Ohio Rev. Code Ann. §§ 3354.03, 3355.03, 3357.04 (Page 1980) (Community college, university branch and technical college districts are

"bod[ies] corporate with all the powers of a corporation, existence, with pow'r to sue and be sued, to incur debts, liabilities, and obligations."). Thus, the statutory scheme under which the medical school exists does not support a finding that MCO has a "legal personality" independent from the State of Ohio.

## Overall Autonomy from the State?

Under Revised Code section 3350.01, the "government" of MCO is vested in a board of trustees, nine in number, all of whom are appointed by the governor with the advice and consent of the state senate. The statute further provides staggered nine-year terms for the trustees, denies them compensation for their services (but permits reimbursement for expenses), and establishes a quorum of a majority of the board members. Section 3350.02 requires the board to elect a chairman and vice-chairman annually, and the board treasurer must give bond to the state, approved by the Attorney General of Ohio, "for the faithful performance of his duties and the proper accounting for all moneys coming into his care." Thus, the state legislature has exercised considerable control over the organization and functioning of the school's governing body.

By contrast with the boards of trustees of community college, university branch and technical college districts established under the Revised Code (which are vested with "all right, title, interest in and to all property, both real and personal, pertaining" to their respective institutions), Ohio Rev.Code Ann. §§ 3354.13, 3355.10, 3357.12 (Page 1980), MCO's trustees merely hold "in trust" that real or personal property given to the college. *Id.* § 3350.04. And as mentioned earlier, any land obtained through the proceeds of a bond issue is taken in the name of the state. *Id.* § 3345.12(P) (Page Supp. 1983). Any conveyance of lands owned or controlled by MCO, to a municipality or county or the state director of transportation, "for any street, road, or highway purpose," must be "drafted by the auditor of state, executed in the name of the state, signed by the governor, countersigned by the secretary of state, and sealed with the great seal of the state." *Id.* §§ 3345.18, 5301.13 (Page 1980 & Supp. 1983). MCO property appears, therefore, to be in reality the property of the State of Ohio.

Even though the college board of trustees is vested with the "government" of the institution, the state retains considerable control over MCO's educational programs. Under Revised Code section 3333.-04(E), the Ohio Board of Regents, which is likewise appointed by the governor, has power to "[r]ecommend the nature of the programs ... which should be offered by the state colleges, universities, and other state-assisted institutions of higher education in order to utilize to the best advantage their facilities and personnel." And the Regents may also recommend what programs should be eliminated from or added to present programs. Ohio Rev. Code Ann. § 3333.04(F), (G) (Page Supp. 1983). All new degrees and new degree programs are subject to approval or disapproval by the Board of Regents, and no new branch or academic center can be established without their approval. *Id.* §§ 3333.04(N), 3333.07(B), (C) (Page 1980 & Supp. 1983). The Regents review MCO's appropriation requests and submit their recommendations thereon to the legislature, *Id.* § 3333.04(J), and MCO is barred from receiving any state appropriation of funds unless it establishes and maintains a department of family practice. *Id.* § 3333.-11, 3350.05.

Other indicia of MCO's lack of autonomy from the state government can be found in the fact that, as noted above, *all* of its receipts and expenditures (and not just state-appropriated funds, *see Gordenstein v. University of Delaware,* 381 F.Supp. at 722) are subject to audit by the state auditor, Ohio Rev.Code Ann. § 3345.05 (Page Supp.1983), and that since July 1, 1983, the state attorney general is "the attorney for each state college and university and shall provide legal advice in all matters relating to its powers and duties." *Id.* § 3345.15. Also, we note that even though liability on

bonds issued by MCO under Revised Code section 3345.12 would be limited to the non-state appropriated revenues pledged by the school to secure those bonds, *Id.* § 3345.12(C), those self-generated funds should, again, be considered "state funds." Moreover, there is no general statutory provision which prohibits MCO from incurring any obligation on the part of the state. *Cf. Hopkins v. Clemson Agricultural College,* 221 U.S. 636, 638–39, 31 S.Ct. 654, 655, 55 L.Ed. 890 (1911) (Section 4 of the Clemson College charter provided that the conditions of any coverage or gift of property or money to the college "shall incur no obligation on the part of the State.").

Finally, we find that "[a]ll property, personal, real or mixed of … the medical college of Ohio at Toledo … is exempt from taxation so long as such property is used for the support of such … college." Ohio Rev.Code Ann. §§ 3345.17 (Page 1980). However, this exemption does not serve to distinguish the school from the community colleges, university branches or technical colleges (heretofore distinguished from MCO by their status as political subdivisions and corporate entities) which also enjoy such tax exempt status. *Id.* §§ 3354.15, 3355.11, 3357.14. And the property of municipalities and, it appears, that of privately-owned colleges and universities as well, have similar tax exemptions under Ohio law. *Id.* §§ 5709.07, .10, .12. (Page 1980 & Supp. 1983). Thus, this factor of the *Blake* analysis is not persuasive in either direction.

## C

■ Taking into account the status of state colleges and universities (including the Medical College of Ohio) under Ohio's law of sovereign immunity and the Court of Claims Act, as well as the sources of revenue available to MCO, its performance of a governmental function, its non-corporate nature, and the fiscal and academic restraints imposed upon the school by state law, this Court must conclude that the District Court did not err in finding that MCO lacks operational autonomy from, and is financially dependent on, the State of Ohio, and is consequently an arm of the state entitled to immunity in federal court. Accordingly, to the extent that Hall's complaint seeks *any* relief against the Medical College of Ohio at Toledo, *see Pennhurst State School and Hospital v. Halderman,* — U.S. ——, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), and damages from the president and dean of that institution in their official capacities, *see Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Foulks v. Ohio Department of Rehabilitation and Correction,* 713 F.2d 1229, 1232 (6th Cir.1983), summary judgment for those defendants was proper under the Eleventh Amendment. We are still left, however, with the suits for damages against the individual defendants in their individual capacities, *see Scheuer v. Rhodes,* 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Foulks,* 713 F.2d at 1233, and for reinstatement by President Ruppert and Dean Kemph in their official capacities, *see Edelman, supra; Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

## II

### Qualified Immunity

■ "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Such qualfied immunity is available to public school officials, *see Wood v. Strickland, supra,* and the newly-refined standard for raising such immunity, announced in *Harlow,* is applicable in § 1983 actions against state officials which arose prior to the Supreme Court's decision in that case, *Wolfel v. Sanborn,* 691 F.2d 270, 272 (6th Cir.1982), *cert. denied,* 459 U.S. 1115, 103 S.Ct. 751, 74 L.Ed.2d 969 (1983). As a result, we will

only examine the status of the relevant constitutional law at the time Hall was expelled (April-June 1978) in order to review the lower court's finding that the individual defendants are entitled to immunity.

Although Hall initially claimed in this lawsuit that he was denied equal protection of the laws, and subjected to unlawful racial discrimination, he appears to have dropped that theory before this Court. But considering the negative report by the Office of Civil Rights on Hall's Title VI administrative charge, as well as Hall's failure to allege any specific examples of racially discriminatory intent on the part of the individual defendants, we would, in any event, hold that no genuine issue of fact existed as to whether the defendants' actions violated Hall's "clearly established" constitutional and statutory right to be free from racial discrimination by MCO officials. Consequently, we only consider the claimed due process violations.

■ Hall first asserts that he was denied due process of law when he was prevented from having his attorney present in the formal disciplinary hearing before the defendant faculty members Sodeman, Higgins, Budd, Ross and Gandy. However, just because his expulsion from a state medical school on grounds of academic dishonesty may implicate a liberty interest protected by constitutional due process guarantees, this does not mean that Hall was necessarily entitled to all the incidents of a full-blown judicial trial. We can find no case authority to "clearly establish" that he had the right to counsel in such a hearing in 1978.

As stated by the Supreme Court in *Goss v. Lopez,* " '[o]nce it is determined that due process applies, the question remains what process is due.' " 419 U.S. 565, 577, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). The Court in *Goss* dealt with the nature of due process required before public high school students could be suspended for up to ten days, and held that only an oral or written notice of the charges and an oppor-

tunity by the student to present his side of the story were "due" in those circumstances. Stating that "[w]e stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident," *Id.* 419 U.S. at 583, 95 S.Ct. at 740. Justice White, writing for the Court, made it clear that they were then addressing only the question of short suspensions, and that "[l]onger suspensions or expulsions ... may require more formal procedures." *Id.* at 584, 95 S.Ct. at 741.

Three years later, and approximately one month before Hall's disciplinary hearing was conducted, the Supreme Court had occasion to address the issue of when such "more formal procedures" might be required. *Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). In *Horowitz,* a divided Court held that a student dismissed for academic deficiencies (not disciplinary reasons) from the University of Missouri-Kansas City Medical School was not entitled to a hearing before the school's decisionmaking body. Justice Rehnquist, in his majority opinion, distinguished disciplinary proceedings, as discussed in *Goss,* from academic evaluations which are, by nature, more subjective than "the typical factual questions presented in the average disciplinary decision." *Id.* at 90, 98 S.Ct. at 955.

Thus, the posture of the law in 1978 was such that *some kind* of formal hearing was apparently required before a student could be expelled for disciplinary causes (such as cheating). But there was no certainty as to what these formalities might entail. Hall, in his memorandum in support of his motion for partial summary judgment in the trial court, cited a number of cases purporting to require the right to have counsel present in school disciplinary hearings. *Norton v. Discipline Committee,* 419 F.2d 195 (6th Cir.1969) (East Tennessee State University), *cert. denied,* 399 U.S.

906, 90 S.Ct. 2191, 26 L.Ed.2d 562 (1970); *Mills v. Board of Education*, 348 F.Supp. 866 (D.D.C.1972) (D.C. public schools); *Givens v. Poe*, 346 F.Supp. 202 (W.D.N.C.1972) (N.C. public schools); *Jones v. State Board of Education*, 279 F.Supp. 190 (M.D.Tenn. 1968) (Tennessee A & I State University), *aff'd*, 407 F.2d 834 (6th Cir.1969), *cert. dismissed*, 397 U.S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970); *Esteban v. Central Missouri State College*, 277 F.Supp. 649 (W.D. Mo.1967), *aff'd*, 415 F.2d 1077 (8th Cir. 1969), *cert. denied*, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970). A review of these cases shows that the district courts in *Givens* and *Esteban* did, in fact, hold that there was a right to counsel. However, this Court in *Norton* went no further than to note, in finding that due process had been satisfied in that case, that the students in question had had the opportunity to be represented by counsel at their hearing. 419 F.2d at 200. District Judge Miller in *Jones* (whose opinion this Court adopted) made a similar finding, and did not expressly hold that the right to counsel was a requisite to due process in such circumstances.

Significantly, the late Judge Miller (who later served on this Court) cited to *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.1961), *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), as "[t]he leading case involving the application of these basic principles to a disciplinary proceeding conducted by a state supported educational institution." 279 F.Supp. at 197; *see also Goss*, 419 U.S. at 576 n. 8, 95 S.Ct. at 737 n. 8 (*Dixon* was a "landmark decision"). In *Dixon*, the Fifth Circuit established the following standards:

> The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college.

294 F.2d at 158–59. When *Norton* and *Jones* are construed in light of *Dixon*, and of the later developments in *Goss* and *Horowitz*, we cannot see any basis for Hall's claim that he was deprived of any right to counsel which was "clearly established" in this Circuit. We do not, however, speak to the issue of whether such a right *should* exist in this kind of disciplinary proceeding.

■ Turning to Hall's other allegations of due process violations, we find that he was given timely notice of both of the charges against him, including the fact that his academic record would be considered since his scores on the two exams in question were much higher than his previous performance. Although the school may have violated its own (unwritten) practice in not requiring one of Hall's student accusers to put her charge against Hall in writing, that particular charge was not the basis for the decision to expel Mr. Hall (though one of the panel members reportedly considered that person's testimony significant), and such a violation of internal rules does not establish a cognizable constitutional violation in any event. *See Board of Curators v. Horowitz*, 435 U.S. at 92 n. 8, 98 S.Ct. at 956 n. 8. Hall was further afforded the opportunity to testify on his

own behalf, to present his own witnesses, and to cross-examine those witnesses presented by Associate Dean Gerber (including his principal accusers). He was given a copy of the hearing panel's report, and of the decisions of Dean Kempf and President Ruppert adopting its recommendations. A formal transcript of the hearing was prepared and (presumably) available to Hall, and he was able to point out what he perceived to be the deficiencies in the hearing and the panel's decision during his meeting with the college president. Aside from the question of counsel, it is hard to see what further procedural safeguards could have been provided without turning this hearing process into an exact equivalent of a courtroom trial—something that no court has yet required.

■ We also find baseless Hall's vague accusations that the entire hearing process had been somehow contrived, as a "kangaroo court," to drive him from medical school after he refused to withdraw voluntarily and seek psychiatric counselling. Hall received adequate notice of the charges, and was permitted to offer evidence in his own behalf. The hearing record contained evidence supporting the panel's conclusion. Thus, we cannot conclude that any other "clearly established" constitutional rights were violated in Hall's expulsion from MCO. Accordingly, the individual defendants are entitled to immunity from liability for damages in their individual capacities, and summary judgment was properly granted on that ground.

### III

### Reinstatement

■ The foregoing reasons for affirming the entry of summary judgment against Hall do not, however, resolve the entire case. The District Court erred in sweeping Hall's claim for reinstatement within the scope of the qualified immunity available to the individual defendants. To the contrary, "immunity from damages does not ordinarily bar equitable relief as well." *Wood v. Strickland*, 420 U.S. at 315 n. 6, 95 S.Ct. at 997 n. 6; *Jacobson v.*

*Tahoe Regional Planning Agency*, 566 F.2d 1353, 1366 (9th Cir.1978), *aff'd in part, rev'd in part sub nom. Lake County Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).

■ We note, though, that there was clear evidence that Hall had improperly consulted an old examination in his student mailbox while he was still taking the locomotor segment test on February 3, 1978. Moreover, there was evidence that he was not a good student, did not get along with his fellow students, and received barely passing grades except on the exams in which he was accused of cheating (and his papers received excellent grades). It was obvious that he would not be a good doctor, assuming that he would have otherwise graduated from medical school and passed the state medical board examination. Therefore we hold, as a matter of law, that MCO had good cause for expelling Hall from medical school, and thus his expulsion was not caused by whatever due process violation might have occurred when he was denied the assistance of legal counsel at his disciplinary hearing. *See Codd v. Velger*, 429 U.S. 624, 628–29, 97 S.Ct. 882, 884–85, 51 L.Ed.2d 92 (1977); *Kendall v. Board of Education*, 627 F.2d 1, 6 n. 6 (6th Cir.1980). As a result, there is no need to remand for consideration of the claim for reinstatement and the merits of Hall's argument that a right to counsel exists at such a hearing.

MERRITT, Circuit Judge, dissenting.

I disagree with the Court's treatment of the eleventh amendment issue. Much of the income of the college and hospital comes from patient fees and tuition, not from the state. No funds of the college and hospital are placed in the state treasury. The state maintains an independent system of payment and accounting. The college and hospital are empowered to enter into contracts without prior approval of the state, and they do not take title to property in the name of the state. They are controlled entirely by a governing

board and administrative officials with no significant intervention by the Governor or by state departments controlled by the Governor. The college and hospital are not institutions accountable to the voters, as are the legislature and the Governor and his executive departments. The college and hospital are not, in the words of the eleventh amendment, "one of the United States," and I can see no valid reason for excepting yet another public institution from the discipline and control of the law by granting it a complete immunity and an unreviewable discretion. The Supreme Court has recently given a narrow interpretation to the definition of state agency, *see Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), and I believe our Court is giving an overly broad scope to the eleventh amendment immunity.

I do not find that the issue concerning the student's right of counsel in the disciplinary proceeding has been raised or argued on appeal. Neither the appellant's brief nor the appellee's responsive brief mentions any issue concerning right to counsel in the disciplinary preceeding. The Court's discussion of this issue, therefore, is unnecessary, and I would not reach the issue.

In addition, I am unable to conclude on the basis of the record before us that the student should lose his case on the merits in the absence of any discussion of the issue in the briefs or at oral argument, or any decision by the Court below.

I accept the District Court's findings and conclusions regarding the good faith of the individual defendants and agree that they should be accorded a qualified immunity from liability. This qualified immunity, however, does not operate to shield them from injunctive relief for reinstatement.

Therefore, the case should go back to the District Court for further proceedings against the individual defendants in respect to plaintiff's claim for injunctive relief for reinstatement and against the college and hospital unshielded by an Eleventh Amendment immunity.