Carol HUTCHINS, et al., Plaintiffs,

v.

**BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY, et al., Defendants.**

No. G79–87 CA.

United States District Court, W.D. Michigan, S.D.

Oct. 11, 1984.

Jean L. King, Ann Arbor, Mich., for plaintiffs.

Byron Higgins, Mich. State University, East Lansing, Mich., Leland W. Carr, Jr., Anderson, Carr & Street, Lansing, Mich., for defendants.

## OPINION

BENJAMIN F. GIBSON, District Judge.

In 1979, a group of women who played on the Michigan State University (MSU) basketball team instituted this action against Michigan State University, its Board of Trustees, and the individual members of that Board. Plaintiffs alleged sex discrimination and pointed specifically to the difference between the funds provided the male and female basketball teams for lodging and meal allowances while on the road.

A preliminary injunction was entered on April 1, 1981 and continues in effect. That order enjoins the University from discriminating against women basketball players with respect to meal and lodging allowances.

The case was certified as a class action in February of 1982. Three subclasses were created: 1) future members of the varsity women's basketball team; 2) team members from February 5, 1979, when the suit was initiated, until the date of class certification; and 3) team members from February 5, 1976 through February 5, 1979.

Plaintiffs seek both injunctive and monetary relief. For the members of the second and third subclasses, plaintiffs seek compensation in the amount that the University allegedly should have provided for meals and lodging. For members of the first subclass, plaintiffs seek both monetary damages and a permanent injunction requiring the University to provide the same funding for meals and lodging for female basketball players that it provides for male basketball players.

Plaintiffs assert three grounds for relief. Count I advances a claim based on an implied cause of action under the Fourteenth Amendment. Count III implies a cause of action based on a Ninth Amendment right to privacy. Count II is a 42 U.S.C. § 1983 claim based on the constitutional violations alleged in Counts I and III.

Defendants have filed a motion to dismiss claiming that this Court lacks jurisdiction over claims for monetary relief and that plaintiffs have failed to state a claim upon which relief may be granted. In support of their jurisdictional defense, defendants argue that the Eleventh Amendment deprives this Court of jurisdiction to award any monetary relief.

### I. Eleventh Amendment Jurisdictional Bar

A suit by a private party which seeks to impose legal or equitable liability payable from state funds is barred in a

federal court by the Eleventh Amendment. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Thus, if MSU is an "arm" or "alter ego" of the state of Michigan, the Eleventh Amendment bars this Court from awarding monetary relief. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

Because of what appeared from the pleadings and briefs to be unique factual circumstances, this Court held an evidentiary hearing on the Eleventh Amendment issue. The Court now rules that defendants are protected by the Eleventh Amendment from any monetary judgment in this action.

### A. The Arguments

In *Weisbord v. Michigan State University,* 495 F.Supp. 1347 (W.D.Mich.1980), this Court held that MSU was entitled to Eleventh Amendment immunity. That case arose in a context similar to that now before the Court, a civil rights action alleging discrimination based on sex and race. After analyzing the relation of MSU to the State of Michigan, this Court concluded that "[n]othing in the charter of Michigan State University states or implies that it is anything other than a state institution entitled to the privileges and immunities of the state or that an assessment against it would come from any source other than the treasury of the State of Michigan." *Id.* at 1357.

Plaintiffs have sought to distinguish this case from *Weisbord* by suggesting that a monetary award in plaintiffs' favor would in fact come from a source other than the treasury of the State of Michigan. At the evidentiary hearing, plaintiffs offered proof that the MSU athletic department has a discretionary, unbudgeted account that could be used to satisfy an award in this case. That account contains funds from private donations and from investment earnings. It does not contain any funds appropriated by the State legislature to MSU.

The question before the Court is whether the existence of this independent athletic department account removes the Eleventh Amendment bar against monetary relief. Without disclaiming the possibility that a factual situation might arise in which MSU would not be entitled to Eleventh Amendment immunity, the Court does not find that the facts presented in this case warranted a departure from the conclusion reached in *Weisbord.* In deciding that MSU is entitled to Eleventh Amendment protection, the Court relies on the guidance provided by the Sixth Circuit's recent opinion in *Hall v. Medical College of Ohio,* 742 F.2d 299 (6th Cir.1984).

### B. Application of the *Hall* test

In *Hall,* the Sixth Circuit adopted a nine-point analysis to determine whether a public college or university is entitled to Eleventh Amendment immunity:

[L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.

*Hall, supra,* at 302, *quoting Blake v. Kline,* 612 F.2d 718 (3d Cir.1979), *cert. denied* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980).

As the following discussion reveals, the Court has found that only one factor clearly weighs in favor of plaintiffs' position.

Several factors, although initially appearing to favor plaintiffs' position, are, at best, ambiguous. The majority of factors, as well as the most important factors, weigh in favor of defendants' invocation of Eleventh Amendment immunity.

### 1. Factor in favor of plaintiffs' position

Michigan State University has the power to sue and be sued and to enter into contracts. *See Sprik v. Regents of the University of Michigan*, 43 Mich.App. 178, 204 N.W.2d 62 (1972), *aff'd*, 390 Mich. 84, 210 N.W.2d 332 (1973); *Branum v. Board of Regents of University of Michigan*, 5 Mich.App. 134, 145 N.W.2d 860 (1966). To the extent that this factor is controlling, plaintiffs can argue that MSU should not fall under the state's protective umbrella.

### 2. Ambiguous factors

MSU is a separately incorporated state institution. MICH. CONST. art. VIII, § 5. Without further clarification by state law, this fact would suggest that MSU should not be treated as an arm of the state. *See Hall, supra*, at 305. The Michigan Supreme Court, however, has emphasized that the legislature's provision for autonomy should not be interpreted as an indication that the University is free of legislative control. In a case involving the University of Michigan, the state supreme court noted that the constitutional corporate status was necessary to keep the state universities above political flux and controversy, adding that "it was not the intention of the framers of the constitution to take away from the people the government of [these] institutions[s]. On the contrary, they designed to, and did, provide for [their] management and control by [bodies] of eight men elected by the people at large." *Sterling v. Regents of University of Michigan*, 110 Mich. 369, 379, 68 N.W. 253 (1896).

Although the University has some autonomy over its operations, *see* MICH.COMP. LAWS ANN. §§ 390.106–.123 (1976), it is subject to the control of the state legislature. All departments in the university are governed by policies established by the Board of Trustees, a body elected by the voters of the state. MICH. CONST. art. VIII, § 5. The University itself reports annually to the legislature and is subject to audit by the state. MICH. CONST. art. VIII, § 4.

Property of the University is immune from state taxation. *Auditor General v. The Regents of the University of Michigan*, 83 Mich. 467 (1890) (establishing that the University of Michigan, with statutory origins similar to those of MSU, was immune from taxation). Because tax exemptions are so broadly granted under Michigan law, *see* MICH.COMP.LAWS ANN. § 211.7 (1967), however, that factor is not persuasive in either direction. *See, Hall, supra*, at 307.

### 3. Factors in favor of defendants' position

Michigan law establishes a close relationship between Michigan State University and the State of Michigan. MSU is a body corporate created by the Michigan Legislature pursuant to Article VIII, section 5, of the Michigan constitution. *See* MICH. COMP.LAWS ANN. §§ 390.101–.225 (1976). Under Article VIII, section 4, the Legislature is required to maintain the University. Evidence submitted at the hearing established that, in the 1982–83 fiscal year, state appropriations accounted for thirty-six percent of MSU's total funds. MICHIGAN STATE UNIVERSITY, FINANCIAL REPORT 1982–83 3. Article VIII, section 4, of the constitution also provides that MSU must make a financial accounting to the Legislature. MSU complies with this provision by submitting an annual financial report. The University is governed by a Board of Trustees, whose members are elected by the voters of the state and serve without compensation. MICH. CONST. art. VIII, § 5; MICH.COMP.LAWS ANN. § 390.103 (1976).

Under Michigan statutes, the state universities are accorded sovereign immunity in state courts to the same extent that the

state itself is. For example, MSU, like the state, is immune from tort actions arising out of any acts undertaken in furtherance of its governmental functions. MICH. COMP.LAWS ANN. § 691.1407 (1968 & Supp.1983); *see also* MICH.COMP.LAWS ANN. § 691.1401–.1415 (1968 & Supp. 1983).

Thus, it appears that Michigan law treats MSU as an arm of the state. Of course, the question of the University's Eleventh Amendment status is a matter of federal, not state, law. Yet, to the extent that local law is one factor to be considered, the status given to MSU under Michigan law suggests that MSU should be accorded Eleventh Amendment immunity.

MSU is pursuing a traditional governmental function by providing for higher education. *See Hall, supra,* at 305. Its physical education program is a part of the overall educational program of the University. Plaintiffs have not argued that, by sponsoring a program of intercollegiate athletic competition, MSU has undertaken a proprietary activity. Although it is clear that the University makes money from the ticket receipts of basketball, football and baseball, Assistant Vice-President Terry testified that the revenues from these sports are used to support a program of "non-revenue" intercollegiate sports for men and women. Thus, the Court does not find that the University is pursuing a proprietary function in this case.

The parties presented no evidence relating to the question of whether the state has immunized itself from responsibility for MSU's operations. In *Ewing v. Board of Regents of the University of Michigan,* 552 F.Supp. 881, 883 & n. 5 (E.D.Mich. 1982), Judge Feikens apparently concluded that it has not, noting that state statute provides that a judgment against a state university must be executed against the state itself. *See* MICH.COMP LAWS ANN. §§ 600.6021, 600.6095 (1968).

Of the nine factors considered in *Hall,* the Sixth Circuit described the second and third as most important. These factors require the Court to consider whether the MSU Board of Trustees would have the power to satisfy a judgment awarded in this case and whether such a judgment would be ultimately paid out of the state treasury.

■ Plaintiffs have argued that, although in most cases a judgment against MSU would be a judgment against the state treasury, the possibility that an award in this case could be satisfied out of an unbudgeted athletic department account makes this case different. Plaintiffs' argument rests on three assertions: first, that a discretionary athletic fund exists; second, that the Board of Trustees has the power to satisfy a judgment out of that fund; and, finally, that the athletic department discretionary account is not made up of "state funds." *See Hall, supra,* at 304. The Court finds that, although the first and second assertions are valid, the third is not.

Testimony at the evidentiary hearing established that several unbudgeted accounts exist for the use of the athletic department. The Court gathers from the testimony that an account is "unbudgeted" if the Board of Trustees does not allocate funds for that account from the general University fund.

Stephen Terry, the Assistant Vice-President for Finance, testified that the intercollegiate athletic program currently receives no state appropriated funds. Instead, it supports itself with independent sources of revenue, including revenues from ticket sales, broadcasting agreements, and private donations. *See also* MICHIGAN STATE UNIVERSITY, FINANCIAL REPORT 1982–83 SUPPLEMENT: OTHER FINANCIAL INFORMATION 31.[1]

Several witnesses testified specifically regarding the "Ralph Young Current Gift Fund," one of the athletic department's four unbudgeted accounts. Unrestricted private donations made to the athletic department, as well as investment earnings from a separate endowment account, are

---

1. Terry did testify, however, that indirect support by the University, such as provision of facilities, custodial services, and accounting services, is "probably significant."

channeled into the Current Gift account. Assistant Vice-President Terry characterized the account as "the athletic director's discretionary account."

It appears to this Court that the Board of Trustees has the requisite statutory authority to make expenditures from this unbudgeted account, without any prior approval of the state legislature. State statute provides that the Board "shall direct the disposition of any moneys appropriated by the legislature or by congress for [MSU] ... *and of any moneys otherwise received for the above purposes.*" MICH.COMP. LAWS ANN. § 309.109 (1976) (emphasis supplied). *See also* MICH. CONST. art. VIII, § 5.

Plaintiffs elicited testimony that, in at least one past instance, MSU has in fact settled a legal dispute by making a settlement payment out of an unbudgeted athletic department account. That previous dispute began when George Perles left the Philadelphia Stars professional football team to become MSU's head football coach. The Stars brought suit against MSU for "stealing" Perles.

The testimony at the hearing regarding the Perles dispute established that the settlement payment was ultimately debited from an unbudgeted athletic department account.[2] Leland Carr, the attorney who negotiated the settlement of that dispute, testified that the settlement was initially paid by means of a cashier's check drawn on his law firm's account. Assistant Vice-President Terry testified that Carr's law firm was reimbursed from the University's general fund account. The settlement amount was then charged to the athletic department unbudgeted account.

In sum, the evidence clearly established that funds in the athletic director's discretionary account come from sources other than state appropriations and that the Board has the power to spend money from

that account. The Court is not convinced, however, by plaintiffs' argument that the account is not made up of "state funds."

Although the athletic director has the power to spend money from the Current Gift account without prior authorization of the Board of Trustees, he is accountable for those expenditures. The testimony of Stephen Terry, the Assistant Vice-President for Finance, and Robert Wenner, the University auditor, established that the athletic director has to report all expenditures made from the Current Gift account to the University's central accounting department. Terry identified himself as the custodian of the Current Gift account and noted that the athletic director is accountable to the Vice-President for Finance. Auditor Wenner testified that, if the director spent funds in a way that was not in accordance with University policy, that University would ask for restitution. Although each expenditure from the fund is not reported to the Board of Trustees, a report of the status of the fund is made annually to the Board. Finally, Assistant Vice-President Terry pointed out that the Michigan Auditor General has the power to audit the unbudgeted, as well as the budgeted, accounts of the University.

Factors that led the Sixth Circuit, in *Hall,* to conclude that funds of the Medical College of Ohio were state funds operate in this case as well. The plaintiffs in that case contended that the Medical College could avail itself of self-generated income from hospital charges, tuition and the like. The Court dismissed that argument by noting that, although the Ohio legislature *permitted* the state colleges and universities to retain such funds, rather than require them to be paid into the state treasury and appropriated back to the schools, the legislature could have just as easily required the converse. Thus, the self-generated income was as much state money as was

---

**2.** Apparently, the money was first transferred from the Ralph Young Current Gift Account into the "Athletic Equity" account. That account was then debited for the amount that had previously been paid out of the University's general fund. The important point, for the purposes of this discussion, is that payment was ultimately made out of an unbudgeted athletic department account.

income directly appropriated by the legislature. *Hall, supra,* at 304–305.

A similar state of affairs exists under Michigan law, which *permits* the Board of Trustees to retain and expend moneys that come to the University from sources other than the state. MICH.COMP.LAWS ANN. § 390.109 (1976). There is no question, however, but that these funds are state funds. The legislature provided that:

> Money due to the institution or received in its behalf shall be collected and received by the business manager and shall be deposited with the treasurer of the board of trustees. The funds deposited shall be subject to warrants signed by the president of the university and the business manager or their authorized agents. The business manager shall render monthly a full and complete account of money received and the warrants drawn on the treasurer, as the business manager of the university, and shall file and preserve vouchers, receipts, correspondence, or other papers relating to the warrants. The business manager shall keep in the business manager's office a complete record of the financial transactions, in a manner which may be approved by the board and the auditor general, and which shall be made available to the public in compliance with Act No. 442 of the Public Acts of 1976. At the close of each fiscal year, the business manager shall make a full and detailed report of the financial affairs of the institution, together with statistical matter as may be of interest.

MICH.COMP.LAWS ANN. § 390.120 (Supp.1983).

Other factors reinforce the conclusion that the funds in the unbudgeted accounts are state funds for the purposes of the Eleventh Amendment. The Michigan constitution requires the Michigan legislature to support MSU. MICH. CONST. art. VIII, § 4. *See Hall, supra,* at 304. There was testimony at the hearing that, if the unbudgeted accounts were depleted, the University would rely on the general fund, supported in part by state appropriations, to replenish those accounts. Further, money that comes into the unbudgeted accounts is commingled with that in the general University fund. *See Hall, supra,* at 305.

For these reasons, this Court concludes that the funds within the Current Gift account are state funds for Eleventh Amendment purposes and that any judgment against that fund would create a liability payable from the state treasury. As the Sixth Circuit concluded in *Hall,* "[c]reating any distinction between [MSU's] appropriated and self-generated revenues in the context of Eleventh Amendment immunity would be a pure exercise in elevating form over substance." *Hall, supra,* at 305.

Based on the above analysis, the Court dismisses those claims asserted by the plaintiffs calling for monetary relief. Specifically, all claims on behalf of subclasses two and three are dismissed. The claims of subclass one remain only to the extent that they seek injunctive relief.

Defendants' motion to dismiss also argues that plaintiffs have failed to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Because the Court has focused its inquiry on the Eleventh Amendment issues raised at the evidentiary hearing, it has not addressed that issue. To the extent the argument applies to plaintiffs' claims for injunctive relief, defendants remain free to raise it at a later time.

## II. Dismissal of Counts I and III

Counts I and III of plaintiffs' complaint are claims based on implied rights of action under the Fourteenth and Ninth Amendments. Neither the Supreme Court nor the Sixth Circuit have decided whether an implied cause of action may be derived from the Fourteenth Amendment or the Ninth Amendment. *See Mt. Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977); *Harris v. City of Canton,* 725 F.2d 371, 374 n. 3 (6th Cir. 1984).

Because the Court finds that the parameters of the plaintiffs' § 1983 claim are co-extensive with the implied constitutional claims, it need not decide whether such claims should be recognized. Whatever relief would be available to plaintiffs under Counts I and III is available under Count II. Therefore, Counts I and III are dismissed. *See Weisbord v. Michigan State University*, 495 F.Supp. 1347, 1354 (W.D. Mich.1980); *see also Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (courts should avoid unnecessary decisions on constitutional issues); *Rogin v. Bensalem Township*, 616 F.2d 680, 685 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981).