HARRIS v UNIVERSITY OF MICHIGAN BOARD OF REGENTS

Docket No. 177036. Submitted January 10, 1996, at Grand Rapids. Decided November 5, 1996, at 9:00 A.M. Leave to appeal sought.

Scott A. Harris brought an action in the Court of Claims against the University of Michigan Board of Regents, James J. Duderstadt, the university's president, and Jack Weidenbach, the university's athletic director, seeking damages for injuries sustained by the plaintiff, a member of the university's men's intercollegiate gymnastics team, during a team visit to Colorado for a gymnastics competition. The plaintiff was injured in a sledding accident when, between competitions, the team's coach, Robert K. Darden, II, led the team on a sledding outing. Pursuant to stipulation, the Court of Claims case was consolidated with a case that the plaintiff brought against Darden in the Washtenaw Circuit Court. All the defendants moved for summary disposition on the basis of governmental immunity. The trial court, Donald E. Shelton, J., denied Darden's motion, but granted summary disposition for the Board of Regents, Duderstadt, and Weidenbach and dismissed the Court of Claims action. The plaintiff appealed.

The Court of Appeals *held*:

Intercollegiate athletics is a governmental function of a public university that entitles it to governmental immunity. The proprietary function exception to governmental immunity does not apply under the facts of this case.

1. The plaintiff failed to produce evidence that created a genuine issue of fact whether the athletic program was a proprietary function. The record supports the conclusion that profit is not the primary motive for the athletic program and that intercollegiate athletics is normally supported by taxes. The court properly determined that the university's operation of its athletic program was not a proprietary function and that the university was entitled to governmental immunity. Summary disposition for the Board of Regents in the Court of Claims action was appropriate.

2. The trial court properly granted summary disposition for the two individual defendants in the Court of Claims action on the basis that the plaintiff failed to allege any facts that could establish

that they were grossly negligent and therefore not entitled to governmental immunity.

Affirmed.

1. GOVERNMENTAL IMMUNITY — INTERCOLLEGIATE ATHLETICS.

Intercollegiate athletics is a governmental function of a state university that entitles it to governmental immunity (MCL 691.1407; MSA 3.996[107]).

2. GOVERNMENTAL IMMUNITY — PROPRIETARY FUNCTION EXCEPTION.

An activity must be conducted by a governmental entity primarily for the purpose of producing a pecuniary profit and not normally be supported by taxes or fees to be considered a proprietary function not subject to governmental immunity; whether an activity is proprietary does not depend on whether it actually generates a profit; a governmental agency may conduct an activity on a self-sustaining basis without being subject to the proprietary function exception (MCL 691.1413; MSA 3.996[113]).

3. GOVERNMENTAL IMMUNITY — GOVERNMENTAL EMPLOYEES — GROSS NEGLIGENCE — SUMMARY DISPOSITION.

A governmental employee is entitled to summary disposition on the basis of statutory governmental immunity in a jury action where it is uncontroverted that the employee was acting within the scope of authority while in the exercise or discharge of a governmental function and the court finds that, on the pleaded facts, reasonable jurors could not conclude that the defendant's conduct had been so reckless as to demonstrate a substantial lack of concern for whether an injury would result (MCL 691.1407[2]; MSA 3.996[107][2]).

*Kantner and Associates* (by *Veronique Lerner*), for the plaintiff.

*C. J. Hurbis* and *Mary F. Clinton*, for the defendants.

Before: NEFF, P.J., and SAAD and MARKEY, JJ.

SAAD, J.

I

NATURE OF THE CASE

This case raises two interrelated legal questions of first impression and of particular importance to intercollegiate athletics in Michigan. First, is intercollegiate athletics a governmental function of a public university so as to immunize the university from tort liability? Second, if so, does the proprietary function exception to governmental immunity apply under the facts of this case? For reasons stated in this opinion, we hold that intercollegiate athletics is a governmental function of a state university that entitles it to governmental immunity and that, on the record presented here, the proprietary function exception does not apply.

II

FACTS AND PROCEEDINGS BELOW

Plaintiff, a student member of the University of Michigan men's intercollegiate gymnastics team, sued the University of Michigan Board of Regents, the university president (James J. Duderstadt), the director of athletics (Jack Weidenbach), and the gymnastics coach (Robert K. Darden, II) for injuries that he sustained during a team visit to Colorado for a gymnastics competition. The trial court denied Darden's motion for summary disposition, but granted summary disposition for the Board of Regents, Duderstadt, and Weidenbach, on the basis of governmental immunity. Plaintiff now appeals from the grant of summary disposition.

On March 7, 1990, plaintiff was in Colorado with the University of Michigan's gymnastics team. The gymnastics team is operated by the university's

athletic department. Between competitions, coach Darden led the team on a sledding outing and provided plastic trash bags for the team to use as sleds. While sledding, plaintiff crashed into a tree at the bottom of the slope and injured his face and head.

Plaintiff filed two lawsuits. Plaintiff first filed suit in the Court of Claims against defendants Board of Regents, Duderstadt, and Weidenbach and alleged that because the athletic department's activities were conducted primarily to produce a profit, they are proprietary and therefore not sheltered by governmental immunity. Pursuant to stipulation, this case was consolidated with a case in the Washtenaw Circuit Court in which plaintiff sued Darden for negligence.

After consolidation, all defendants moved for summary disposition on the basis of governmental immunity under MCL 691.1407; MSA 3.996(107). The university argued that operating an athletic program was a governmental function for which it was entitled to immunity. Duderstadt and Weidenbach contended that they were entitled to governmental immunity because plaintiff failed to allege gross negligence against them. In response to defendants' motion, plaintiff argued that the athletic department was engaged in a proprietary function, not a governmental function, and that he had properly pleaded his claims against Duderstadt and Weidenbach.

The trial court found that the "operation of a program of intercollegiate athletics is a legitimate function of an educational institution and [has] certainly traditionally been so." As such, the trial court found that athletic programs at state universities are " 'expressly or impliedly mandated or authorized by constitution, statute . . . or other law' and are there-

fore a government function." (Citations omitted.) After
finding that the athletics program was a government
function, the trial court proceeded to address plain-
tiff's argument regarding the proprietary function
exception and found:

> Affidavits submitted by the University, as well as audits
> submitted by the plaintiff, conclusively establish that only
> football and basketball at the University produce revenues
> which exceed expenses and that all other sports, including
> men's gymnastics, operate at a loss and are supported by
> football and basketball net revenues. It is abundantly clear
> that the nonrevenue sports, including the one at issue here
> are not conducted primarily for profit. Nor does the submit-
> ted material suggest that the athletic program as a whole is
> a proprietary function.

Therefore, the trial court granted summary disposi-
tion to the Board of Regents, Duderstadt, and Weiden-
bach in the Court of Claims action. Plaintiff now
appeals.

### III

### ANALYSIS

### A. GOVERNMENTAL FUNCTION

The University of Michigan (and its governing
board, the Board of Regents) is one of the govern-
mental units to which Michigan's governmental
immunity statute applies. MCL 691.1401(c),(d);
MSA 3.996(101)(c),(d).[1] MCL 691.1407(1); MSA
3.996(107)(1) provides:

---

[1] Const 1963, art 8, § 5 provides, in relevant part:

> The regents of the University of Michigan and their successors in
> office shall constitute a body corporate known as the Regents of
> the University of Michigan. . . . Each board shall have general

Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

"Governmental function" is broadly defined by the Legislature as "an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(f); MSA 3.996(101)(f). According to well-established case law, this definition is to be broadly applied and requires only that "there be *some* constitutional, statutory or other legal basis for the activity in which the governmental agency was engaged." *Pawlak v Redox Corp*, 182 Mich App 758, 764; 453 NW2d 304 (1990), citing *Hyde v Univ of Michigan Bd of Regents*, 426 Mich 223, 253; 393 NW2d 847 (1986). If an activity conducted by a governmental entity is considered a governmental function, then such activity is immune from tort liability unless one of the exceptions to governmental immunity applies. MCL 691.1401 *et seq.*; MSA 3.996(101) *et seq.* Here, plaintiff argues that (1) intercollegiate athletics is not a governmental function and (2) the proprietary function exception applies to strip the university of any governmental immunity.

First, plaintiff argues that the university was not engaged in a governmental function in operating the

supervision of its institution and the control and direction of all expenditures from the institution's funds.

athletic department or the gymnastics team of which plaintiff was a member. We disagree. Given the broad definition of a governmental function, and in light of the history of intercollegiate athletics at Michigan universities and colleges that has historic support from the Michigan Legislature, we find that intercollegiate athletics is a governmental function for purposes of immunity. We will discuss analogous case law from Michigan and sister states that supports this conclusion. We will also point to federal and state legislative support for our finding that intercollegiate athletics is a governmental function.

Numerous Michigan cases have held that physical education activities provided by a public high school constitute a governmental function. See, e.g., *Cody v Southfield-Lathrup School Dist*, 25 Mich App 33; 181 NW2d 81 (1970) (high school physical education activities, and gymnastics in particular, constitute a governmental and not a proprietary function); *Lovitt v Concord School Dist*, 58 Mich App 593; 228 NW2d 479 (1975) (despite the fact that admission was charged to football games, the administration of a high school football program is a governmental, not a proprietary, function); *Churilla v East Detroit School Dist*, 105 Mich App 32; 306 NW2d 381 (1981) (the administration of a high school football program is a governmental function).

The rationale for these decisions is equally applicable to intercollegiate athletics: (1) team sports and competitions are properly a part of a school's overall physical education program, (2) the function of a physical education and related sports program is

inherently educational, and (3) because such a program is educational, it is properly considered a governmental function. *Id.* at 35. As will be discussed below in connection with our analysis of the proprietary function exception, the fact that the activity generates incidental profit or revenue does not change the character of that function. *Lovitt, supra* at 597.

Although no Michigan case has squarely and expressly extended this analysis from the high school physical education program to the university intercollegiate context, this extension is fully warranted. *Hutchins v Michigan State Univ Bd of Trustees,* 595 F Supp 862 (WD Mich, 1984). In *Hutchins,* several members of the MSU women's basketball team alleged sex discrimination, pointing to the difference between the funds provided the male and female basketball teams for lodging and meal allowances while on the road. The court eventually held that, as a matter of federal law, MSU was protected from any monetary judgment by immunity granted under the Eleventh Amendment. In reaching this conclusion, however, the court noted that Michigan law was one factor that was properly considered. *Id.* at 866. In discussing Michigan law on this point, the court reasoned:

> MSU is pursuing a traditional governmental function by providing for higher education. *Its physical education program is a part of the overall educational program of the University.* Plaintiffs have not argued that, by sponsoring a program of intercollegiate athletic competition, MSU has undertaken a proprietary activity. Although it is clear that the University makes money from the ticket receipts of basketball, football and baseball, Assistant Vice-President Terry testified that the revenues from these sports are used to support a program of "non-revenue" intercollegiate sports for men and women. Thus, the Court does not find that the

University is pursuing a proprietary function in this case. [*Id.* Citation omitted and emphasis added.]

Thus, in *Hutchins*, the federal court clearly considered MSU's operation of its intercollegiate women's basketball program to be a governmental, not a proprietary, function.

We find further support for this conclusion and expressly adopt the reasoning from federal and state courts that have analyzed the importance of intercollegiate athletics to higher education. For example, in *Greenhill v Carpenter*, 718 SW2d 268, 271 (Tenn App, 1986), the court stated:

[F]or well over one hundred years athletic programs have been an integral part of the educational process in colleges and universities throughout this country, not only in football, but baseball, basketball, and other sports too numerous to mention. The development of a student's physical body, team work, and sportsmanship have all been part of the college and university educational process, notwithstanding the fact that in recent years big-time college athletics have at times taken on a tinge of commercialism.

Again, stressing the important role of intercollegiate athletics to higher education, the court in *Cohen v Brown Univ*, 991 F2d 888, 891 (CA 1, 1993), reasoned:

For college students, athletics offers an opportunity to exacuate [sic] leadership skills, learn teamwork, build self-confidence, and perfect self-discipline. In addition, for many student-athletes, physical skills are a passport to college admissions and scholarships, allowing them to attend otherwise inaccessible schools. These opportunities, and the lessons learned on the playing fields, are invaluable in attaining career and life successes in and out of professional sports.

Similarly, in *Kondos v West Virginia Bd of Regents*, 318 F Supp 394, 396 (SD WV, 1970), aff'd 441 F2d 1172 (CA 4, 1971), the court held that the defendant university regents were immune from ordinary tort liability, reasoning as follows:

> However, for the [governmental immunity] provision to be operative, the particular function involved must be governmental rather than proprietary. The defendant Board of Regents unquestionably meets this test, for it is elemental that education, which is its business, is a governmental function of the state and, of course, *the carrying on of an athletic program is an important and necessary element in the educational process, especially at institutions of higher learning.* [Citations omitted and emphasis added.]

Moreover, the Michigan Legislature and Congress have implicitly recognized that intercollegiate athletics is an appropriate governmental function that deserves legislative support. In the Higher Education Facilities Authority Act, MCL 390.921 *et seq.*; MSA 15.2097(121) *et seq.* (which relates to post-high-school education), our Legislature set forth procedures for, among other things, the acquisition, construction, or alteration of educational facilities. MCL 390.923, 390.925; MSA 15.2097(123), 15.2097(125). The act defines an "educational facility" to include "a structure available for use as a[n] . . . athletic facility . . . and other structures or facilities related thereto or required or useful for the instruction of students·or the conducting of research or the operation of an institution for higher education." MCL 390.922(c); MSA 15.2097(122)(c). This represents further explicit legislative recognition that athletics are an inherently proper part of the educational function and mission of institutions of higher learning.

Congress apparently considers collegiate athletics sufficiently related to higher education to embrace such activities within the exemption from federal income tax accorded to educational institutions under § 501(c)(3) of the Internal Revenue Code—26 USC 501(c)(3)—income generated by university or college sports teams from admission tickets and broadcasting revenue is not considered "unrelated business income" subject to tax. *Rensselaer Polytechnic Institute v Comm'r of Internal Revenue*, 732 F2d 1058 (CA 2, 1984).

All these factors and considerations, including analogous case law and relevant state and federal legislation, compel the conclusion that intercollegiate athletics should properly be regarded as a governmental function for governmental immunity purposes. Yet, plaintiff argues that this activity is proprietary, not governmental. So, before we finally conclude that intercollegiate athletics is entitled to governmental immunity, we must examine whether such activity could fall within the proprietary function exception to such immunity.

### B. PROPRIETARY FUNCTION EXCEPTION

There are five major statutory exceptions to the broad sweep of governmental immunity. See MCL 691.1402 *et seq.*; MSA 3.996(102) *et seq.* (defective highways), MCL 691.1405; MSA 3.996(105) (government-owned vehicles), MCL 691.1406; MSA 3.996(106) (public buildings), MCL 691.1413; MSA 3.996(113) (proprietary function exception), and MCL 691.1407(4); MSA 3.996(107)(4) (government hospitals). Technically, one of these "exceptions" is the

proprietary function exception, which is set forth in relevant part in MCL 691.1413; MSA 3.996(113):

> The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted *primarily for the purpose of producing a pecuniary profit* for the governmental agency, excluding, however, any activity normally supported by taxes or fees. [Emphasis added.]

To be a proprietary function, an activity must be conducted primarily for the purpose of producing a pecuniary profit *and* not normally be supported by taxes or fees. *Adam v Sylvan Glynn Golf Course*, 197 Mich App 95, 97; 494 NW2d 791 (1992). Whether an activity is proprietary does not depend on whether the activity actually generates a profit, although the existence of a profit is relevant to the intent of the governmental entity. *Id.* at 97-98. A governmental agency may conduct an activity on a self-sustaining basis without being subject to the proprietary function exception. *Id.* at 98.[2]

Here, plaintiff argues that there are sufficient facts for the jury to determine whether the university's athletics program was a proprietary function. In particular, he relies on financial statements that show that the athletics program generated a surplus in 1991 and

---

[2] If profit is deposited in a general fund or used for unrelated events, such use indicates a pecuniary motive. *Taylor v Detroit*, 182 Mich App 583, 587; 452 NW2d 826 (1989). On the other hand, use of profits to defray the expenses of the activity itself indicates a nonpecuniary purpose. *Id.* The fact that an activity generates a consistent profit may show an intent to produce a profit, but it is not sufficient to make the activity proprietary because generating a profit must be the *primary* motive. *Murphy v Muskegon Co*, 162 Mich App 609, 621-622; 413 NW2d 73 (1987).

1992 and received donations of over $5 million. Plaintiff appears to argue that if an activity is self-supporting, then it is proprietary. To the contrary, evidence that an activity is merely self-supporting indicates that it is *not* proprietary. *Taylor v Detroit*, 182 Mich App 583, 587; 452 NW2d 826 (1989).

After carefully reviewing the evidence properly before the trial court, it is obvious that many, if not most, of the sports programs at defendant university lose money. Indeed, as is no doubt common knowledge, the men's football and basketball programs are usually the only sports programs that generate net revenue, and plaintiff has provided no evidence to the contrary. Obviously then, if the primary motive of the athletic department were to produce a profit, sports such as gymnastics that are not profitable would be dropped from the program. The fact that the university has not done so is strong evidence that the athletic program is not conducted primarily for profit.

With regard to the other part of the proprietary function exception, we have already noted in our analysis of "governmental function" that the Legislature has a long history of financial support for our public universities, including their athletic programs. It is therefore apparent, and indeed not seriously disputed by plaintiff, that such activities *are* normally supported by taxes.

When viewed logically, the proprietary function exception is not so much an "exception" to the broad sweep of governmental immunity (such as the government vehicle exception, MCL 691.1405; MSA 3.996[105]), as it is the *antithesis* of a governmental function itself. That is, as statutorily defined, the proprietary function exception means that an activity is

*not* a governmental function because the primary motive is to make a profit and is one not normally supported by taxes and fees. If both these tests are met, the activity would seem to be proprietary, not governmental. Yet, in accordance with *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984), the definition of governmental function is to be broadly interpreted, and the broader and more extensive the definition of "governmental function," the less room there is for finding a proprietary function exception. Indeed, as we hinted above, once the governmental function analysis is made and it has been determined that the activity has the indicia of a traditional governmental function, the conclusion is virtually inevitable that the activity in question is not proprietary. However, we do not, and cannot, conclude that for all cases a finding of governmental function forecloses any analysis of the proprietary function exception.

Yet, here, the case is clear—once we conclude as we have that intercollegiate athletics is a governmental function, the predicate for rejecting a proprietary function exception argument has been established. We therefore conclude that plaintiff has failed to produce evidence that created a genuine issue of fact regarding whether the university's athletic program was a proprietary function. Plaintiff was unable to establish that profit was the university's *primary* motive in operating its athletic program or that intercollegiate athletics was not normally supported by taxes. To the contrary, the record supports the conclusion that profit is not the primary motive and that intercollegiate athletics is normally supported by taxes. The trial court correctly determined that the

university's operation of its athletic program was not a proprietary function, and thus the university was entitled to governmental immunity from plaintiff's claims.[3] Summary disposition for the Board of Regents in the Court of Claims action was therefore appropriate.

Plaintiff separately argues that the trial court erred in granting summary disposition to Duderstadt and Weidenbach on the basis of governmental immunity. The governmental immunity afforded to individual employees or officers is set forth in MCL 691.1407; MSA 3.996(107), which provides in relevant part:

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . shall be immune from tort liability for injuries to persons or damages to property caused by the officer, employee, or member while in the course of employment or service or volunteer while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this

---

[3] Plaintiff argues at length that the trial court erred in relying upon an affidavit from Robert DeCarolis, an assistant athletic director in charge of internal operations, in reaching its decision. Defendants acknowledge that the affidavit inadvertently was never served on plaintiff. However, the only significant fact in the affidavit is DeCarolis' testimony that all sports other than men's football and basketball operate at a loss. In light of the other evidence before the court, any error in the trial court's admission or consideration of the affidavit was harmless error and not grounds for reversing summary disposition. See MCR 2.613(A).

subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

Here, the trial court properly granted summary disposition to Duderstadt and Weidenbach, because it reasoned that plaintiff had not alleged any facts that could establish that Duderstadt and Weidenbach were grossly negligent. We agree. The statute defines "gross negligence" as "conduct [which was] so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(2)(c); MSA 3.996(107)(2)(c). Summary disposition is precluded in cases in which reasonable jurors honestly could have reached different conclusions with regard to whether the defendants' conduct amounted to gross negligence. *Vermilya v Dunham*, 195 Mich App 79, 83; 489 NW2d 496 (1992). However, if, on the basis of the evidence presented, reasonable minds could not differ, then the motion for summary disposition should be granted. *Id.* After careful review of the record, we conclude that there was no evidence presented that could have raised a jury question regarding this issue. Summary disposition for the two individual defendants in the Court of Claims action was therefore appropriate.

Affirmed.

MARKEY, J., concurred.

NEFF, P.J. I concur in the result only.