# STATE OF MICHIGAN

# COURT OF APPEALS

REAL LIFE LIVING SERVICES, INC.,

Plaintiff-Appellant,

v

CITY OF MANISTEE HOUSING
COMMISSION,

Defendant-Appellee.

UNPUBLISHED
April 12, 2016

No. 325994
Manistee Circuit Court
LC No. 14-015344-CZ

Before: BOONSTRA, P.J., and WILDER and METER, JJ.

PER CURIAM.

Plaintiff, Real Life Living Services, Inc. (RLLS), appeals as of right from the trial court's order granting summary disposition to defendant, City of Manistee Housing Commission (CMHC), under MCR 2.116(C)(7) (claim barred by immunity), regarding RLLS's claims for tortious interference and business defamation. The trial court held that CMHC was entitled to immunity under the Governmental Tort Liability Act (GTLA), MCL 691.1401 *et seq.* We affirm.

## I. FACTS AND PROCEDURE

According to its allegations in the trial court, RLLS is a Michigan nonprofit corporation that provides home care and mental health services "to persons with developmental disabilities and/or mental illnesses in residential settings . . . under contracts [with] various state, county, and local mental health agencies," and under contracts with private individuals. On the other hand, CMHC is a municipal housing commission, which is statutorily authorized, *inter alia*, to "purchase, acquire, construct, maintain, operate, improve, extend or repair housing facilities and eliminate housing conditions which are detrimental to the public peace, health, safety, morals or welfare." MCL 125.652; see also MCL 125.653 (governing the creation of municipal housing commissions). Among other housing developments, CMHC owns Century Terrace Apartments, which it operates as a low-income housing project.

-1-

In September 2013, RLLS entered into an agreement with Centra Wellness Network (CWN)[1] under which RLLS was to provide services, for the 2014 fiscal year, to several CWN clients who were then residents at Century Terrace. However, according to RLLS's allegations in the trial court:

> On or before January 22, 2014, CMHC Executive Director [Clinton] McKinven-Copus[,] and/or other CMHC staff under the direction of McKinven-Copus, contacted CWN and reported allegations that were knowingly false, or which McKinven-Copus made no attempt to [verify], concerning damage to CMHC that CMHC attributed to RLLS staff and threatening to evict CWN's clients at Century Terrace unless CWN terminated its contract with RLLS.

Thus, CWN sent correspondence to RLLS providing a 60-day notice of intent to terminate its September 2013 agreement with RLLS. Around that time, in addition to the five CWN clients that RLLS serviced at Century Terrace, it was also providing services to six non-CWN clients, all of whom resided at Century Terrace or one of CMHC's other properties.

On March 6, 2014, CMHC informed RLLS via correspondence that its agents and employees were henceforth banned from Century Terrace—and all other CMHC properties—and would be reported to the police as trespassers if they appeared on CMHC property. In support of its decision, CMHC listed three reasons: (1) "[m]alicious destruction of property by [RLLS]employees," (2) failure by such employees "to report, or to have the tenant . . . report . . . destruction and or damages to a rental unit," which CMHC characterized as "a material violation of [its] lease" agreement with such tenants, and (3) "[r]emoval of smoke detectors from tenant units by [RLLS] employees; a material violation of the tenant[s'] lease and a violation of the City of Manistee Codified Ordinances[.]"[2] A copy of the same correspondence was sent to the director of the local Department of Human Services (DHS).[3] The next day, on March 7, 2014, CMHC sent a letter to its tenants informing them of the RLLS ban. CMHC also informed its tenants that, after April 1, 2014, it would, after first providing a formal warning, terminate the tenancies of any tenants who continued to permit access to individuals associated with RLLS.

Several months later, RLLS filed a five-count complaint against CMHC, alleging four counts of tortious interference with contract (and related business expectancies) and one count of business defamation. Along with other purported damages, RLLS averred that, as a "but for" result of CMHC's actions, RLLS lost several clients, and it also lost Medicaid funding for two of its clients. All told, RLLS claimed that CMHC's "unlawful interference" caused RLLS to lose $449,344 in annual revenue.

---

[1] Also known as Manistee Benzie Community Mental Health Organization.

[2] RLLS denied such allegations, responding that it "routinely reported, or assisted clients in reporting" damage to CMHC's rental units.

[3] Now the Department of Health and Human Services (DHHS).

After CMHC moved for summary disposition based on governmental immunity, RLLS amended its complaint, asserting that CMHC was unentitled to governmental immunity. In support, RLLS contended that CMHC's actions (i.e., its alleged communications with third parties about CMHC) did not constitute the exercise of a governmental function.

CMHC subsequently renewed its motion under MCR 2.116(C)(7), again arguing that it was entitled to governmental immunity and, therefore, to summary disposition. It argued that, contrary to the allegations in RLLS's amended complaint, CMHC's operation of a housing facility qualified as a "governmental function" as that phrase is defined by § 1 of the GTLA, MCL 691.1401(b). CMHC further argued that no exception to governmental immunity was applicable. After considering the matter, the trial court agreed, holding that RLLS's claims were barred by governmental immunity. Thus, the trial court granted summary disposition to CMHC. This appeal followed.

## II. ANALYSIS

We review de novo a trial court's decision regarding a motion for summary disposition under MCR 2.116(C)(7). *Ducharme v Ducharme*, 305 Mich App 1, 5; 850 NW2d 607 (2014).

> When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate. [*Dextrom v Wexford Co*, 287 Mich App 406, 428-429; 789 NW2d 211 (2010) (footnotes omitted).]

Related issues of statutory interpretation are also reviewed de novo. *Ducharme*, 305 Mich App at 5.

On appeal, RLLS does not contest the trial court's ruling that CMHC, as a municipal housing commission, is *generally* entitled to immunity under the GTLA. Nor does RLLS argue that any of the statutory exceptions to immunity are applicable. Rather, RLLS argues that CMHC's "delivery of its ultimatum to CWN"—i.e., CMHC's ultimatum that it would "evict CWN's clients at Century Terrace unless CWN terminated its contract with RLLS"—constituted an "ultra vires act" regarding which CMHC is unentitled to immunity. In other words, RLLS contends that the "ultimatum" exceeded CMHC's statutory authority as a municipal housing commission, and therefore CMHC is not entitled to immunity. We disagree.

While engaged in a "governmental function," a governmental agency "is immune from tort liability." *Palmer v Western Mich Univ*, 224 Mich App 139, 141; 568 NW2d 359 (1997). Accordingly, "when a party files suit against a governmental agency, it is the burden of that party to plead his or her claim in avoidance of governmental immunity." *Hannay v Dep't of Transp*,

497 Mich 45, 58; 860 NW2d 67 (2014). "Courts are required to broadly construe the term 'governmental function,' while strictly construing exceptions to governmental immunity." *Tellin v Forsyth Twp*, 291 Mich App 692, 699; 806 NW2d 359 (2011). To decide whether "an act is a 'governmental function,' we look to the general activity involved rather than the specific conduct engaged in when the alleged injury occurred." *Genesee Co Drain Comm'r v Genesee Co*, 309 Mich App 317, 327; 869 NW2d 635 (2015) (quotation marks and citation omitted). In pertinent part, the GTLA defines "governmental function" as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(b). That definition must "be broadly applied and requires only that there be *some* constitutional, statutory or other legal basis for the activity in which the governmental agency was engaged." *Harris v Univ of Mich Bd of Regents*, 219 Mich App 679, 684; 558 NW2d 225 (1996) (quotation marks and citations omitted).

Hence, the instant inquiry requires us to determine whether CMHC's alleged "ultimatum" to CWN occurred while CMHC was engaged in the exercise of a governmental function. The trial court held that it did. We agree.

Municipal housing commissions, such as CMHC, are creatures of statute. See MCL 125.653. Such commissions are, under MCL 125.652, authorized to "purchase, acquire, construct, maintain, operate, improve, extend or repair housing facilities and eliminate housing conditions which are detrimental to the public peace, health, safety, morals or welfare." Further, MCL 125.657 grants municipal housing commissions "the following enumerated powers and duties":

> (a) To determine in what areas of the city or village it is necessary to provide proper sanitary housing facilities for families of low income and for the elimination of housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare;

> (b) To purchase, lease, sell, exchange, transfer, assign and mortgage any property, real or personal, or any interest therein, or acquire the same by gift, bequest or under the power of eminent domain; to own, hold, clear and improve property; to engage in or to contract for the design and construction, reconstruction, alteration, improvement, extension, and/or repair of any housing project or projects or parts thereof; to lease and/or operate any housing project or projects;

> (c) To control and supervise all parks and playgrounds forming a part of such housing development but may contract with existing departments of the city or village for operation or maintenance of either or both;

> (d) To establish and revise rents of any housing project or projects, but shall rent all property for such sums as will make them self-supporting, including all charges for maintenance and operation, for principal and interest on loans and bonds, and for taxes;

(e) To rent only to such tenants as are unable to pay for more expensive housing accommodations;

(f) To call upon other departments for assistance in the performance of its duties, but said departments shall be reimbursed for any added expense incurred therefor.

(g) It shall have such other powers relating to said housing facilities project as may be prescribed by ordinance or resolution of the governing body of the city or village or as may be necessary to carry out the purposes of this act.

Regarding the "control" of a commission's housing projects, MCL 125.662 provides, "The commission shall have complete control of the entire housing project or projects including the construction, maintenance and operation as fully and completely as if said commission represented private owners." Moreover, pursuant to MCL 125.694b, municipal housing commissions are required to adopt and promulgate certain "reasonable" rules:

(1) To the extent not inconsistent with federal law or regulation, state law, or local ordinance, the housing commission shall adopt and promulgate reasonable rules that establish the following:

(a) Eligibility requirements for admission to housing.

(b) Obligations of tenants, including regulations for the use and occupation of housing units and common areas.

(c) Just cause for the termination of the right of use and occupation, so that a tenant may be clearly apprised of the precise reasons for a termination.

(d) Conditions for continued occupancy, taking into account factors including, but not limited to, family size, fluctuations in income, availability of standard accommodations elsewhere, and other relevant matters.

* * *

(2) The commission may adopt other rules that are necessary for the just and effective administration of local housing projects constructed and operated as provided by this act.

(3) All rules to be valid shall be published in a conspicuous place in each housing project operated by the commission.

Finally, municipal housing commissions may terminate a tenant's tenancy only for "just cause," which includes, but is not limited to, (1) "failure to comply with the obligations of the lease or the lawful rules and regulations of the housing commission," (2) "[t]he use of a unit for any unlawful purpose, including any purpose for which the commission is entitled to recover possession of the premises by summary proceedings under [MCL 600.5714]," and (3) "[t]he

-5-

maintenance of any unsafe, unsanitary, or unhealthful condition in any dwelling unit or in any of the common areas."  MCL 125.694a.

After reviewing the statutory provisions above, we are convinced that CMHC's purported communications regarding RLLS to DHS, CWN, and CMHC's tenants all occurred while CMHC was engaged in the exercise of a governmental function, specifically the operation and management of Century Terrace as a public housing project.  There is more than just *some* implicit legal basis for CMHC to engage in such activity; it is activity directly authorized by statute.  See MCL 125.652 *et seq*.

As it did in the trial court, on appeal RLLS urges us to focus on the specific conduct at issue, i.e., CMHC's purported communications regarding RLLS, instead of the general activity in which CMHC was engaged, i.e., the operation and management of Century Terrace.  RLLS's argument in that regard is contrary to the well-established principle, previously referenced, that "we look to the general activity involved rather than the specific conduct[.]"  See *Genesee Co Drain Comm'r*, 309 Mich App at 327 (quotation marks and citation omitted).  And here, the general activity was clearly the operation and management of Century Terrace, not the allegedly tortious communications.  Indeed, RLLS offers no reason, and we perceive none—aside from CMHC's general activity of operating and managing housing projects—why CMHC would have reason to concern itself with RLLS and its employees at all, let alone to make  statements, defamatory or otherwise, about RLLS to third parties.  On the contrary, CMHC's communications regarding RLLS were squarely related to CMHC's ownership, operation, maintenance, and management of Century Terrace.

Because CMHC was engaged in a governmental function at the time it allegedly committed the torts at issue here, the trial court correctly concluded that CMHC was immune from liability under the GTLA.  Consequently, summary disposition for CMHC was properly granted under MCR 2.116(C)(7).

Affirmed.  As the prevailing party, CMHC may tax costs pursuant to MCR 7.219.


/s/ Mark T. Boonstra
/s/ Kurtis T. Wilder
/s/ Patrick M. Meter

-6-